IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

GALVESTON DIVISION

| | | |
|---|---|---|
| INTREPID SHIP MANAGEMENT, INC., | § | |
| VESSEL MANAGEMENT SERVICES, INC. | § | |
| and CROWLEY MARITIME CORP. | § | |
| | § | |
| V. | § | CIVIL ACTION NO. G-12-243 |
| | § | (Consolidated w/G-12-cv-359) |
| OCEAN PROSPECTOR, her equipment, | § | |
| tackle, appurtenances, et., *in rem*, and | § | |
| PLANT RECOVERY COMPANY, | § | |
| *in personam*, et al. | § | |

## REPORT AND RECOMMENDATION

Before the Court, by referral from the Honorable Gregg Costa, United States Circuit Judge (Sitting by Designation), is, *inter alia*, the Motion for Partial Summary Judgment of Defendant-Cross Plaintiff Malin International Ship Repair and Drydock, Inc. (Malin). The Motion has been exhaustively briefed and is ripe for adjudication. Having considered the Motion, the arguments of the Parties and the applicable law, this Court now issues this Report and Recommendation.

This litigation involves the oft-renamed semi-submersible drilling rig, with a lengthy well-known history on this Court's docket. The Defendant, OCEAN PROSPECTOR, sometimes referred to in this case as the VIKING PROSPECTOR, will hereinafter unceremoniously be referred to as simply the "Rig". Despite the Rig's frequent appearance in this Court, a brief rendition of the facts relevant to the current disputes at issue is in order.

On July 25, 2011, two seminal events occurred: an individual named Francisco Moreno purchased the Rig at a U.S. Marshal's auction and Moreno and PRC Environmental, Inc. (PRC) entered into the "VIKING PROSPECTOR Joint Venture Dismantling Agreement" (Joint Venture) for the purpose of selling the Rig for scrap and dividing the profits. At the time, the rig was

moored at Gulf Copper's Shipyard where, pursuant to the Joint Venture, PRC was to dismantle it.

On August 2, 2011, Moreno created Prospector Rig MGT, LLC (PRM) with the intent of conveying the Rig to it in return for a 100% ownership of PRM. Around May 10, 2012, the decision was made to move the Rig to Malin's shipyard and covert it to a floatel. PRC and Malin then entered into an agreement for Malin to perform the preliminary conversion work: to ready the Rig for its tow to a drydock facility in Brownsville where the conversion would could be completed.

On August 4, 2012, the RESOLVE, a tug/barge owned by Intrepid Ship Management, Inc., Vessel Management Services, Inc. and Crowley Maritime Corporation (collectively "Crowley") allided with the underwater starboard pontoon of the Rig; both vessels were damaged. This litigation ensued. In the meantime, PRC ran up in excess of, *inter alia*, $1 million dollars in dockage fees with Malin which it failed to pay. As a result, Malin sued the Rig *in rem* and ultimately purchased it at a Marshal's auction on July 15, 2013. The Rig has since been completely dismantled, therefore, upon the resolution of the current round of litigation it will, mercifully, no longer haunt the Court's docket.

## MALIN'S MOTION

Malin is a party to this suit because, *inter alia*, Crowley seeks indemnification from it for the damages, if any, it may suffer from PRC and PRM's claims against it for repairs to the Rig and the profits they anticipated would flow from the Joint Venture. Because of Crowley's indemnification claims against it, Malin may assert any of Crowley's possible defenses. Federal Insurance Co. v. Mariner Energy, Inc., 2006 U.S. Dist. LEXIS 86624 at *11 (S.D. Tex., Nov. 27, 2006)   Consequently, Malin's Motion also targets PRC's claims against Crowley. In

addition, the Motion targets PRC and PRM's claims against Malin for fraud and fraudulent inducement related to the misrepresentations Malin allegedly made about the safety of its docking arrangements.  Crowley has filed its own Motion for Partial Summary Judgment, bit it has also joined in Malin's Motion.  The Court will, therefore, consider Crowley's parallel arguments in this Report and Recommendation.  The crux of Malin's Motion is that  neither PRC nor the Joint Venture ever had any ownership interest in the Rig and they, therefore, lack the standing to pursue these claims.  It is significant to note that Moreno and the Joint Venture are not parties to this suit.

## ANALYSIS

PRC argues that the Joint Venture owned the Rig and that PRC is before the Court *qua* the Joint Venture.  PRM argues that it has an ownership interest because Moreno transferred the Rig to it at its formation and also assigned PRM his interest in the Joint Venture.

The Court begins with an examination of the Joint Venture Agreement.  Moreno's significant "contribution" to the Joint Ventrue was the Rig he had purchased.  PRC's significant "contribution" was the performance of the dismantling.  To "contribute" means to supply.  The agreement makes no mention of a conveyance of title to the Rig to the Joint Venture.   In fact, Article 7.01(ii) provides that "so long as PRC promptly undertakes its obligations under this agreement," Moreno agrees he "will not engage with any third parties to purchase" the Rig.  Moreno's reservation of the right to sell the Rig if PRC breached the Joint Venture agreement is clear evidence that he did not intent to convey the Rig to the Joint Venture.  Furthermore, Article 8.04 provides that the Parties "will execute such other and further instruments and documents as are or may become necessary or appropriate to effectuate and carry out the enterprise intended by this agreement."  From the face of the agreement itself, it is clear that the Joint Venture did not

own the Rig and PRC has produced no document(s) transferring title to the Rig from Moreno to the Joint Venture, as would be required by Article 8.04.  In fact, on November 29, 2012, after learning of PRC's indebtedness to Malin, Moreno's attorney, Obed De La Cruz, requested in a letter to PRC that it either pay Malin or "Purchase the (Rig) from Francisco Moreno under terms agreeable to both."  Moreover, as Malin points out, if the Joint Venture owned the Rig, it, not PRC or PRM would be the proper party, see Corinth Joint Venture v. Lomas & Nettleton, 667 S.W. 2d 593, 595 (Tex. App. -- Dallas, 1984), and, depsite PRC's present assertion to the contrary, neither has ever made such an appearance in this case.

    PRM's argument, likewise, fails.  The organizational document of PRM's states, in pertinent part, that "Moreno, *will* convey his complete ownership" in the Rig "in exchange for 100% ownership" in PRM. (emphasis added)  The language clearly indicates the actual conveyance was to be a future act, not a *fait accompli*.  No other documentation evidencing a conveyance of the Rig has been produced.  The Court assumes, without finding, that the Rig, which had been out of service for years, was no longer a registered vessel, so a Certificate of Documentation or its equivalent probably did not exist at the time of Moreno's purchase.  However, Moreno would have received a Bill of Sale from the Marshal following the sale, pursuant to the District Court's Order, to facilitate any subsequent registration and, at the very least, a Bill of Sale should exist as evidence of any subsequent conveyance by Moreno to PRM.  Furthermore, the organizational document makes no mention of any transfer or assignment of Moreno's interest in the Joint Venture to PRM, but none has been produced.

    PRC and PRM's assertions of ownership become even more tenuous by the necessary implication that Article 8.04 of the Joint Venture Agreement would apply and require the

execution of the transferring "instruments and documents . . . necessary . . . to . . . carry out the enterprise" of converting the Rig into a floatel and that Article 8.08 would require the "express *written* consent" of PRC to any transfer or assignment of Moreno's interest in the Joint Venture to PRM, but none has been produced.  (emphasis added)

Finally, on September 15, 2014, long after the briefing schedule for the instant Motions had expired, PRM produced an unauthenticated "Resolution and Assignment of Claim" apparently signed by Moreno, "on behalf of" PRM, and the president of PRC.  It was executed by them on that same day, September 15, 2004; however, the document indicates an effective date of August 5, 2012, one day after the allision.  The document further states that "the Rig has been an asset of the Joint Venture since no later than August 5, 2012."  While being an asset of the Joint Venture would usually infer ownership, it is not a conclusive term and, as indicated above, it cannot be sufficient in this case.  Not surprisingly, Crowley and Malin both brand the document a collusive "sham" and object to its tender, but, at best, it would be a *post hoc* attempt to create standing on a date long after this lawsuit was commenced, August 23, 2012, which is the date when a claimant's standing is required to exist.  Pederson v. Louisiana State University, 213 F.3d 858, 869 (5th Cir. 2000) (Standing is the requisite personal interest that must exist at the commencement of the litigation and continue throughout its existence.)

It is a well-established maritime rule that "denies a plaintiff recovery for economic loss if that loss resulted from physical damage to property in which he had no proprietary interest."  In re Bertucci Contracting Co., 712 F.3d 245, 246 (5th Cir. 1993) (allision case) (quoting, State of Louisiana, ex rel Guste v. M/V TESTBANK, 752 F.2d 1019, 1022 (5th Cir. 1985) (collision case) PRC and PRM have sued to recover for physical damage done to the Rig and the loss of future

profits from the Rig's conversion, but since neither PRC nor PRM had any ownership in the Rig they lack the standing necessary to pursue those damages.[1]  Their fraud claims, likewise, seek to recover, *inter alia*, damages to the Rig and lost profits attributable to Malin's misrepresentations of its docking arrangements which, in turn, allegedly caused or contributed to the physical damage to the Rig by the allision.  Without the necessary ownership interest in the Rig, PRC and PRM also lack standing to pursue these damages.

For the foregoing reasons, it is the **RECOMMENDATION** of this Court that the "Motion for Partial Summary Judgment" (Instrument no. 111) of Malin and, in this regard, the "Motion for Partial Summary Judgment" (Instrument no. 117) of Crowley also be **GRANTED**.

The Clerk **SHALL** send a copy of this Report and Recommendation to the Parties who **SHALL** have until **Friday, March 20, 2015**, to file written objections.  The Objections **SHALL** be electronically filed and/or mailed to the Clerk's Office at P.O. Drawer 2300, Galveston, Texas 77553.  Failure to file written objections within the prescribed time **SHALL** bar any Party from attacking on appeal the factual findings and legal conclusions accepted by the District Judge, except upon grounds of plain error.

**DONE** at Galveston, Texas, this _____6th_____ day of March, 2015.

_____
John R. Froeschner
United States Magistrate Judge

---

[1]  Even if the District Court were to find that an ownership interest did exist, it was extinguished by the Marshal's sale to Malin and, as a result, any then-existent standing ended as well. Lewis v. Continental Bank Corp., 494 U.S. 472, 477-78 (1990) (A party's personal stake in the lawsuit must continue to exist throughout the pendency of the lawsuit.)